**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Jennifer Morin, being first duly sworn, hereby depose and state as follows:

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since January 2019. Since April 2021, I have been assigned to the Worcester, Massachusetts, Resident Agency of the FBI. Prior to joining the FBI, I served as a Commissioned Officer in the United States Army and as a Special Agent with the Defense Security Service of the United States Department of Defense. I graduated from the FBI Academy, and I have participated in the drafting and execution of complaints and search warrants during my career. In addition, I have received specialized training and gained experience in interview and interrogation techniques, arrest procedures, search warrant applications, evidence identification and collection, and various other criminal laws and procedures.

2. This affidavit is being submitted in support of an application under Federal Rule of Criminal Procedure Rule 41 authorizing the search of Brandon BROUILLARD (born 1993) , David HOGAN (born 1963) and 2 Forkey Avenue, Worcester, Massachusetts 01603 (the "Subject Premises"), as more fully described in <u>Attachments A-1, A-2 and A-3</u>.

3. I am currently investigating BROUILLARD and HOGAN for violations of federal law, including wire fraud, in violation of 18 U.S.C. § 1343, bank fraud, in violation of 18 U.S.C. § 1344 and aggravated identity theft, in violation of 18 U.S.C. § 1028A (hereinafter the "Subject Offenses"). As described below, BROUILLARD and HOGAN reside at the Subject Premises.

4.       As described below, there is probable cause to believe that the Subject Premises contains contraband and evidence, fruits, and instrumentalities of violations of the Subject Offenses, as more specifically described in Attachment B.

5.       The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to only establish the requisite probable cause for the requested search warrant and does not set forth all of my knowledge nor all of the facts involved in this matter.

## PROBABLE CAUSE

6.       The probable cause supporting the requested search warrant is derived from several sources, including (a) reports from financial institutions regarding fraudulent activity connected to the Subject Premises; (b) fraudulent purchases of motor vehicles connected to the Subject Premises; and (c) physical surveillance and observations of BROUILLARD and HOGAN at 2 Forkey Avenue.

A.       Fraudulent Activity From Financial Institutions Connected To Subject Premises

7.       According to information from Digital Federal Credit Union ("DCU"), on September 5, 2019, DCU received a membership application online in the name of Victim 2,[1] with a listed home address outside of the Commonwealth of Massachusetts. The membership application included a separate mailing address of the Subject Premises. DCU ultimately spoke with Victim 2 who reported that Victim 2 had been the victim of identity theft. Victim 2 also

---

[1] The victim numbers here are not in chronological order so as to conform with the identification of victims in other legal process in this case. Investigators know the identity for all of the victims referenced in this affidavit.

2

confirmed that Victim 2's home address matches the home address that was used for the fraudulent membership application.

8. According to information from TIAA Bank, in or about May 2020, the Subject Premises was the address used on a fraudulent account application using the identity of Victim 3.

9. According to information from Worker's Credit Union, on or about July 22, 2020, BROUILLARD applied for an auto loan for a 2015 Mitsubishi Lancer. BROUILLARD listed Victim 4 as his co-signer on the loan application and apparently presented a counterfeit driver's license for Victim 4 in support of the loan application. Before the fraud was detected, Worker's Credit Union approved the loan and, on July 31, 2021, issued a check in the amount of $28,465.38 to "Sonia's Auto Sales." Thereafter, Victim 4 contacted Worker's Credit Union and reported that Victim 4 had never applied for a loan with Worker's Credit Union. Victim 4 further sent a copy of Victim 4's driver's license to Worker's Credit Union, which did not match the license used for the loan.

10. According to information provided by FBS, an online broker-dealer, between August 2020 and September 2020, BROUILLARD opened three accounts with FBS. The checks that BROUILLARD used to fund his accounts were returned by the paying banks. BROUILLARD listed the Subject Premises as his address on his three FBS accounts.

11. According to information from Paypal, on September 4, 2020, BROUILLARD used Victim 1's Paypal account to make an unauthorized purchase of approximately $2,754 from Modern Automotive Performance. Paypal further reported that the shipping address provided for the order was the Subject Premises. Relatedly, according to information from Worker's Credit Union, on or about December 1, 2020, Victim 1 called Worker's Credit Union and reported that

BROUILLARD had stolen more than $10,000 from Victim 1's E-Trade account to use for his car loan with Worker's Credit Union. At the time, BROUILLARD did have a car loan with Worker's Credit Union. Worker's Credit Union in turn contacted E-Trade to report the suspected fraud involving Victim 1's E-Trade account. Worker's Credit Union further reported that according to information from E-Trade, starting on September 26, 2020, there were suspicious log-ins to Victim 1's E-Trade Account and the address of the Subject Premises had been added to the E-Trade account as well.

12. According to information from U.S. Bank National Association, in August 2020, BROUILLARD took control of an account belonging to one of their customers, Victim 5. It appears that BROUILLARD added himself as an "authorized user" for Victim 5's account and directed that an additional card for Victim 5's account be mailed to the Subject Premises. Victim 5 confirmed to U.S. Bank that Victim 5's account had been compromised and that the banking activity was unauthorized.

    B.    <u>Fraudulent Purchases of Motor Vehicles Connected To The Subject Premises</u>

13. According to information from an interview with Boston Motor Sports, Boston, Massachusetts, as well as from the relevant Boston Police Department Report, on April 1, 2021, BROUILLARD purchased a white 2020 Range Rover SUV from Boston Motor Sports. BROUILLARD identified himself as the purchaser to the dealership and provided the Subject Premises as his address on the sales contract for the SUV. According to the dealership, BROUILLARD did not negotiate the price and paid approximately $136,767 for the Range Rover. BROUILLARD provided a bank cashier's check purportedly issued from Charles

4

Schwab in the amount of $136,767 from a Charles Schwab Account ending in 7299 and a check from BBVA USA Bank account ending in 1601 in the amount of $2,500.

14. On April 7, 2021, according to records produced by Boston Motor Sports, a Facebook account named "Brandon Brouillard" posted to a Facebook group called "Mass Tuning" the following message: "Where would I get a 2020 Range Rover Sport tuned . . . New. Fast af. But this is definitely in need of something."[2]

15. On April 8, 2021, BROUILLARD returned to Boston Motor Sports to trade in the Range Rover for a 2019 Porsche GT3 RS.  He complained that the SUV was too large and that he wanted a sports car instead.  The Porsche was priced at $250,078.68, which was significantly higher than the Range Rover.  BROUILLARD produced another Charles Schwab cashier's check listing the same account number ending in 7299 in the amount of $112,311.68 to make up the price difference.  BROUILLARD again listed the Subject Premises as his address on the sales contract for the 2019 Porsche.[3]

16. On April 9, 2021, Boston Motor Sports learned that both Charles Schwab cashier's checks (in the amounts of $137,767.00 and $112,311.68) that BROUILLARD had used were fraudulent.  Charles Schwab advised the dealership that the accounts were actual Schwab accounts but they had been frozen and did not belong to BROUILLARD.  That same day, Boston

---

[2] On May 6, 2021, an FBI agent located several other photographs of steering wheels of vehicles posted to the Facebook account of "Brandon Brouillard" related to the Subject Offenses.

[3] BROUILLARD later commented to his Facebook Post regarding the 2020 Range Rover "Traded in again this time correctly.  Hello GT3rs lol."  This post appears to be a reference to the Porsche (i.e. "GTR3rs"), although the date and time are not clear from the copy of the post that I reviewed.

Motor Sports contacted BROUILLARD and requested that BROUILLARD wire the total amount due or to return the Porsche. The dealership advised BROUILLARD that they would contact police if the car was not returned. BROUILLARD did call and leave a voicemail for a salesperson, but a Boston Motor Sports representative never in fact spoke with him. According to a Boston Police Report, a male whom Boston Motor Sports identified as David HOGAN (born 1963) was present both times when BROUILLARD came in to purchase the Range Rover and Porsche.

17.     On April 10, 2021, Boston Motor Sports recovered the 2019 Porsche from the driveway at the Subject Premises.[4] Boston Motor Sports found the following documentation in the 2019 Porsche when they recovered it: (a) a certified letter envelope and letter from Greenwood Credit Union, 2669 Post Road, Warwick, Rhode Island; (b) a Massachusetts Certificate of Registration for a 2020 White Range Rover (with VIN # ending in 5990); and (c) a personal check folio with blank Charles Schwab checks ranging from 1001 to 1050, listing Victim 6, 15 Monroe Avenue, Worcester, MA, account ending 7299. Also recovered was an

---

[4] Boston Motor Sports is owned by Jim McGovern Auto Group. In addition, on April 10, 2021, Boston Motor Sports/McGovern also repossessed a 2021 Jeep Wrangler Rubicon from 2 Forkey Avenue that had been purchased by HOGAN on March 31, 2021 at McGovern Jeep in Newton, MA. HOGAN paid in cash using a Schwab cashier's check (account ending 7299) in the amount of $56,208.44. Similar to the other Charles Schwab checks, that check was also rejected because the account had been frozen. McGovern Jeep contacted HOGAN by cell phone (number ending 3126) and he promised to wire funds for the Jeep. Also, when HOGAN was at the dealership on March 31, the employees observed BROUILLARD sitting in a white Range Rover outside the dealership.

opened secure mail envelope from Charles Schwab Bank, addressed to Victim 6, 15 Monroe Ave. Worcester, MA.[5]

*Purchase of Chevrolet Camaro*

18.  According to information obtained from the Norwood Police Department, Boch Chevrolet and Victim 1, on April 17, 2021, BROUILLARD purchased a 2021 Chevrolet Camaro from Boch Chevrolet in Norwood, Massachusetts.  BROUILLARD visited the dealership on April 17, 2021 to consummate the deal and identified himself as the purchaser.  BROUILLARD purchased the Camaro for $83,000 using a Charles Schwab cashier's check with account number ending in 7299.  BROUILLARD signed a sales contract and application for Massachusetts title and registration, providing the Subject Premises as his address on both documents.

19.  Prior to and after visiting Boch Chevrolet, records from Boch show that BROUILLARD communicated extensively with the dealership using electronic chats through the dealership website and text messages.  These messages included texts from BROUILLARD in which he told Boch that the Camaro was being kept at 2 Forkey Avenue, and that he had bank accounts at Regions and M&T Banks that he could use to pay for the car.

20.  On April 23, 2021, Boch Chevrolet learned from Charles Schwab that the account listed on the bank check was frozen and funds were not available.  That same day, Boch

---

[5] I know the identity of Victim 6.  Agents are currently ascertaining whether Victim 6 is in fact the accountholder for the Schwab account ending in 7299.

contacted BROUILLARD, who promised that he would wire $83,000 to Boch to pay for the car.[6]

21. On April 26, 2021, Victim 1 contacted the Norwood Police Department and reported that BROUILLARD had attempted to illegally wire $83,000 from Victim 1's bank account. Victim 1 also spoke with the Scottsdale, Arizona Police (where Victim 1 has a residence) about the incident. According to Victim 1, on April 26, 2021, BROUILLARD logged into Victim 1's email and sent an email to Victim 1's bank, Alerus Bank, located in Arizona. In that email, BROUILLARD requested a wire transfer of $83,000. Alerus Bank then reached out to Victim 1 to verify the transfer. Victim 1 advised Alerus Bank that Victim 1 "had no idea what they were talking about" and "not to approve it." Victim 1 further reported that BROUILLARD has been using Victim's 1 identity for several months and that he somehow obtained access to Victim 1's email account. Victim 1 said that since approximately September/October 2020, BROUILLARD has used Victim 1's accounts to purchase appliances that have been shipped to BROUILLARD's address, the Subject Premises. Victim 1 specifically recalled the Forkey Avenue address as the destination for the fraudulently obtained items. Victim 1 estimated that BROUILLARD has used or attempted to use approximately $500,000 of Victim 1's funds to purchase items.

*Purchase of Ford Mustang Shelby*

22. According to information from the Braintree Police Department and Herb Chambers Ford, on April 25, 2021, BROUILLARD sent an inquiry about a 2020 Ford Shelby

---

[6] On April 24, 2021, Boch Chevrolet repossessed the 2021 Chevrolet Camaro from 2 Forkey Avenue in Worcester.

Mustang through the website of Herb Chambers Ford of Braintree, Massachusetts. BROUILLARD subsequently communicated with Herb Chambers by email and phone, and agreed to pay $125,990 for the Mustang. BROUILLARD advised that he would put $40,000 down by a cashier's check and finance the remaining $105,189.25. BROUILLARD e-mailed the dealership a sales agreement and credit application. On both documents, he listed the Subject Premises as his address.

23. BROUILLARD requested that Herb Chambers deliver the Mustang to 15 Monroe Avenue in Worcester.[7] Before Herb Chambers delivered the vehicle, Herb Chambers requested that BROUILLARD email a photo of the cashier's check that he intended to provide. On April 26, 2021, BROUILLARD emailed Herb Chambers a photo of a cashier's check purportedly from Fifth Third Private Bank (account number ending in 0759) in the amount of $40,000.

24. Herb Chambers delivered the Shelby Mustang to BROUILLARD on Monroe Avenue. Soon thereafter, Herb Chambers learned that the Fifth Third cashier's check was fraudulent. Specifically, the routing number on the check did, in fact, belong to Fifth Third; however, the account number listed on the check was fictitious.

25. Thereafter, Herb Chambers attempted to have BROUILLARD voluntarily return the car to the dealership. After those efforts failed, on April 28, 2021, with the assistance of the Worcester Police Department, the Ford Mustang was recovered from the Subject Premises.

---

[7] HOGAN listed 15 Monroe Avenue, Worcester as his address on the sales contract for the Jeep Rubicon he purchased at McGovern Jeep.

*Surveillance of Brouillard and Hogan*

26. As described below, based on surveillance and other information, Agents believe that BROUILLARD and HOGAN reside at the Subject Premises.

27. On May 3, 2021, according to a Natick Police Report, BROUILLARD attempted to use a fraudulent check from E-Trade Bank to purchase a 2021 Audi in the amount of $186,495 at Bernardi Audi in Natick. BROUILLARD left the Natick dealership as a passenger in a red Ford Escape driven by another male. That red Ford Escape bears Massachusetts Registration 1FRH53 and is registered to HOGAN according to Massachusetts Registry of Motor Vehicle records.[8]

28. On May 7, 2021, agents observed BROUILLARD and HOGAN[9] at the Subject Premises. At approximately 8:09am, agents observed HOGAN in the driveway of the residence arguing with a tow truck driver from Lucky 13 Towing and Recovery. Minutes later, at approximately 8:25am, BROUILLARD and HOGAN were observed leaving and returning to the Subject Premises after visiting a local Price Chopper Supermarket. About three hours later at approximately 11:17am BROUILLARD and HOGAN were observed leaving and returning to the Subject Premises after visiting a local Shaw's Supermarket.

29. That same day, May 7, 2021, I interviewed the owner of Lucky 13 Towing and Recovery by telephone. The tow company owner informed me that he was sent to the Subject

---

[8] According to a Worcester Police Report, on April 28, 2021, Worcester Police responded to 2 Forkey Avenue to assist in the repossession of the Ford Mustang. Officers took a photo of a male standing next to a red Ford Escape. That male matches the RMV photograph of HOGAN.

[9] Agents were able to confirm HOGAN and BROUILLARD's identities on May 7 through comparison with photographs of HOGAN and BROUILLARD at McGovern Jeep and Boston Motor Sports provided by the dealerships.

Premises by Workers Credit Union to recover a 2015 White Mitsubishi Lancer. The owner had visited the property on May 6, 2021 to confirm the location and VIN of the 2015 Mitsubishi Lancer, currently parked at the Subject Premises. The owner also provided that the default notice for the 2015 Mitsubishi Lancer listed BROUILLARD and Victim 4, consistent with the information included above that BROUILLARD had compromised Victim 4's identity in connection with the car loan for the Mitsubishi Lancer.

## SUMMARY OF PROBABLE CAUSE

30. Based on the information described above, there is probable cause to believe that the contraband and evidence, fruits, and instrumentalities related to the Subject Offenses will be found at the Subject Premises. More specifically, the Subject Premises was used as part of (a) a fraudulent bank application filed with DCU; (b) a fraudulent bank application with TIAA Bank; (c) a fraudulent car loan application with Worker's Credit Union. Similarly, this address was used as part of fraudulent purchases using Victim 1's Paypal account and BROUILLARD used this address when he added himself to Victim 1's E-Trade Account. BROUILLARD also took control of Victim 5's bank account and directed that an additional bank card be sent to the Subject Premises.

31. BROUILLARD also used the Subject Premises as his residential address in connection with the fraudulent purchases of the Range Rover, the Porsche, the Chevrolet Camaro and the Ford Mustang Shelby. Surveillance has established that BROUILLARD resides at the Subject Premises.

32. Given BROUILLARD's history of stealing identities, there is probable cause to believe that evidence related to identity theft will be found at the Subject Premises. Based on my

11

training and experience, and discussions with other criminal investigators, people engaged in identity theft often times have devices and machines to make counterfeit credit cards and checks. Moreover, such individuals will also keep copies of the stolen identification documents, like driver's licenses, social security cards and bank documents in their residences. Given that BROUILLARD directed that financial institutions use the Subject Premises as the address of record on fraudulent accounts that he opened, there is reason to believe the Subject Premises will contain correspondence and documents related to the Subject Offenses. Such documentation may include bank statements, other financial statements, loan agreements, ATM/debit cards, credit cards and checkbooks in other individuals' names.

33.     As described more fully below, this search warrant also seeks permission to seize not only physical papers and records, but also electronics like computers and cellphones, as there is probable cause to believe that such electronic devices will contain evidence of the Subject Offenses. As described above, there is probable cause to believe that BROUILLARD used electronic devices to facilitate his criminal activity: (a) using his computer to file a loan with Worker's Credit Union for the Mitsubishi Lancer; (b) using Paypal, an online money transmitter, to purchase items while using the identity of Victim 1; (c) applying online for a DCU membership using a stolen identity; (d) communicating by electronic chats with Boch Chevrolet; (e) inquiring about the Ford Mustang online; (f) hacking into Victim 1's email account in an attempt to obtain the $83,000 wire for the Chevrolet Camaro; and (g) using Facebook to post about the Land Rover and Porsche that BROUILLARD purchased fraudulently. Moreover, I know based on my training and experience, and life experience, that people use their computers and cellphones to store information earlier saved in paper form, like bank statements, account

numbers and bank account balances. Therefore, it is necessary to search such computers and cellphones for such evidence.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

34. As set forth above, probable cause exists to believe that the Subject Offenses described above were perpetrated using computer equipment accessing the internet. Therefore, as set forth more fully in Attachment B, I request authorization to search and seize any computer equipment located in the Subject Premises. This request includes any cellphones that belong to BROUILLARD based on his use of electronic devices to perpetrate the Subject Offenses.

35. I also request authorization to search HOGAN and search and seize any cellphones belonging to HOGAN given HOGAN's close association with BROUILLARD and HOGAN's involvement in the Subject Offenses. As described above, (a) there is evidence that HOGAN used a fraudulent check in an attempt to purchase a Jeep at McGovern Jeep; (b) the Charles Schwab account he used was also used by BROUILLARD at Boch Chevrolet; (c) HOGAN and BROUILLARD appear to reside together at the Subject Premises; (d) HOGAN communicated using a cellphone with Boston Motor Sports after he purchased the Jeep where he promised to wire them funds; and (e) HOGAN appears to have given a ride to BROUILLARD when he attempted to fraudulently purchase an Audi on May 3, 2021. As described below, given that HOGAN was involved in a fraudulent transaction and seeing that cellphones are essentially like mini-computers there is probable cause to believe that HOGAN's cellphone will contain evidence of the Subject Offenses, including text messages and phone calls with BROUILLARD and the car dealership, copies of documents like the fraudulent Charles Schwab check that HOGAN provided to McGovern Jeep. Moreover, HOGAN provided a cellphone number to

13

Boston Motor Sports and promised to wire them money, both of which show HOGAN attempted to use electronic means such as a computer or cellphone to perpetrate his fraud.

36. All of the events described above happened in a short period of time and there is probable cause to believe that BROUILLARD and HOGAN would have communicated regarding the purchase and repossession of vehicles during this period of time. They both have cellphones based on the evidence and the common usage of such cellphones between co-conspirators like BROUILLARD and HOGAN gives probable cause to believe they will contain evidence. In addition, searching HOGAN and BROUILLARD's cellphones may also provide further evidence of communications and contact information for other co-conspirators.

37. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by: communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

38. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type

can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

39. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

   a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b. Even after files have been deleted, they may be recovered months or years later. Data remains on the storage medium until it is overwritten by new data. A computer's operating system may also keep a record of deleted data in a "recovery" file.

   c. Computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. Computer users typically do not erase or delete this evidence because special software is typically required for that task.

   d. Similarly, files that have been viewed over the internet are sometimes automatically downloaded into a temporary Internet directory.

   e. Information stored within a computer (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution"

15

evidence can also explain how and when the computer or storage media was accessed or used.

40. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

    a. The volume of evidence for storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.

    b. Technical requirements for analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.

41. Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere. The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular

device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

### UNLOCKING A DEVICE USING BIOMETRIC FEATURES

42. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

43. On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

44. The passcode that would unlock the any cellular device(s) is not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the cellular

device(s) found during the search of the Subject Premises to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

45.   For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of BROUILLARD and HOGAN to the sensor of the devices or place the devices in front of his face for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## CONCLUSION

46.   Based on the information above, there is probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the persons and location described in Attachments A-1, A-2 and A-3.

Sworn to under the pains and penalties of perjury,

/s/ Jennifer Morin
Special Agent Jennifer Morin
Federal Bureau of Investigation

Time and Date:  5/19/2021; 1:55 p.m.

Notice is hereby provided that, pursuant to Federal Rule of Criminal Procedure 4.1, the affiant was sworn by telephone on the date and time indicated above.



HON. MARIANNE B. BOWLER
United States Magistrate Judge

18